IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| DENNIS K. MATNEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 07-3248-CV-S-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in 1960 and has completed high school and training in welding and pipefitting. He has prior work experience as a pipefitter, truck driver, and cemetery laborer. Plaintiff filed his application for benefits on November 19, 1997, alleging a disability onset date of April 15, 1994, due to back and shoulder problems, obesity, learning disorder, depression, and anxiety. Plaintiff's claims were denied initially and on reconsideration. In a decision on October 5, 1998, the Administrative Law Judge ("ALJ") found Plaintiff was not under a disability as defined in the Social Security Act. On January 27, 2000, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. Plaintiff then filed an appeal to this Court. On March 12, 2001, the Court granted Defendant's motion to remand with instructions for the ALJ to reevaluate evidence from Plaintiff's treating psychiatrist, Lyle F. Parks, M.D. On July 26, 2002, after conducting a supplemental hearing, the ALJ issued a new decision

finding that Plaintiff was not disabled. On June 5, 2007, the Appeals Council denied Plaintiff's request for review. Therefore, the ALJ's decision stands as the final decision of the Commissioner.

Plaintiff had previously filed a claim for benefits on November 15, 1994. That claim was denied by initial and reconsidered determinations and by decision of the ALJ dated February 4, 1997. The Appeals Council found no basis for review, and the decision on that application became final when Plaintiff did not further appeal. Both parties agree, therefore, that the time period at issue in this case begins on February 5, 1997, the day after the prior final decision, and continues through December 31, 1999, the last day Plaintiff met the insured status requirements of the Social Security Act. Therefore, the Court will only consider the medical records that are relevant in determining whether Plaintiff was disabled during that time period. However, some discussion of Plaintiff's condition and treatment prior to February 1997, or after December 1999, may be necessary as it pertains to Plaintiff's functional capacity during the period of time at issue.

*A. Medical Records–Mental*

Plaintiff began seeing Dr. Lyle Parks on July 3, 1996. Plaintiff reported having progressive problems with depression, dysphoria and anxiety. Dr. Parks diagnosed Adjustment disorder with depressed mood and a GAF of 65. He prescribed the antidepressant Elavil. R. 208-209. Plaintiff continued to receive psychological counseling and medication refills from Dr. Parks, visiting him thirteen times between July 25, 1996 and January 6, 1998. He was eventually diagnosed with Major Depression, recurrent, severe. Plaintiff appeared to benefit from his medication; on August 26, 1996, for example, Plaintiff reported significant improvement in his mood. Plaintiff was also eventually prescribed Klonopin for anxiety. On November 5, 1996, Plaintiff reported feeling much less anxious and depressed, and was pleased with the improvement. R. 203.

On October 17, 1997, Dr. Parks stated Plaintiff was facing a lot of stressors, but overall appeared to be stable. On November 10, 1997, Plaintiff reported being in a

Case 6:07-cv-03248-ODS   Document 23   Filed 11/14/08   Page 2 of 13

considerable amount of pain. He also reported getting dysphoric and very frustrated with his physical limitations. Dr. Parks stated that Plaintiff seemed to be fairly well controlled on the present medication. R. 196. On December 3, 1997, Dr. Parks' progress notes state:

> His panic attacks are much, much worse. They are out of control. He is having three or four panic attacks a day. He is locking himself inside his home. He has severe agoraphobia. The Klonopin simply is not helping. The Klonopin was never much of a relief for his panic but it did help a little bit about a year ago, but does not seem to be having any effect now.

Dr. Parks discontinued the Klonopin and added a prescription to Xanax. R. 195.

On January 5, 1998, Plaintiff saw Frances Anderson, Psy.D., at the request of the Disability Determinations Section. Plaintiff reported that he was being treated for panic attacks that occur 1-2 times per week, sometimes without a precipitating event. He reported being fearful of crowds and preferring to stay home. He reported feeling depressed. However, Plaintiff reported that his symptoms of depression and anxiety had improved with medication. Dr. Anderson diagnosed Plaintiff with Panic Disorder without Agoraphobia; Alcohol abuse, reportedly in remission; rule out Pain Disorder associated with both psychological factors and general medical condition; and Depressive, passive-aggressive personality traits; with a current Global Assessment of Functioning ("GAF") of 60. R. 186-189.

On January 6, 1998, Dr. Parks' treatment notes state that Plaintiff was "doing well." He also stated that "his mood seemed reasonably stable at this time." However, Dr. Parks also completed a Certification of Permanent and Total Disability wherein he stated that Plaintiff met the criteria to receive Medical Assistance. The definition for Medical Assistance states:

> Individuals must be permanently and totally disabled. They must have some physical or mental impairment, disease, or loss from which recovery or substantial improvement cannot be expected, and which substantially preclude them from engaging in any occupation within their competence <u>for one year or longer</u>.

R. 193. (Emphasis in original).

On January 15, 1998, Glen D. Frisch, M.D., completed a Mental Residual

3

Functional Capacity Assessment. After reviewing Plaintiff's medical records, Dr. Frisch found Plaintiff to be moderately limited in his ability to work with others, complete a normal workday and workweek, and interact appropriately with the general public. R. 215-216.

Dr. Frisch also completed a Psychiatric Review Technique on January 15, 1998, which was affirmed by Paul Stuve, Ph.D., on March 19, 1998. After reviewing the medical records, Dr. Frisch diagnosed anxiety, evidenced by recurrent severe panic attacks, and depression. However, Dr. Frisch found Plaintiff to be only slightly limited in activities of daily living and in maintaining social functioning. He found Plaintiff would not experience episodes of deterioration in a work setting. R. 242-250.

On April 17, 1998, Dr. Anderson completed a Medical Source Statement – Mental. She indicated that Plaintiff was only moderately limited in his ability to remember locations and work-like procedures, follow detailed instructions, maintain concentration, maintain a proper schedule and attendance, work with others, interact with the public, get along with others, and respond appropriately to changes in the work setting. R. 277-278.

Dr. Parks completed Medical/Psychological Source Statements – Mental ("MPSS-M") on April 20, 1998 and on May 22, 1998. The first record indicates that the statement covers the period from February 3, 1996 to April 20, 1998.[1] In both statements Dr. Parks indicated Plaintiff was "moderately" limited in several areas and "markedly" limited in his ability to remember and carry out detailed instructions and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Parks also indicated that Plaintiff's impairment can be expected to last 12 continuous months or more. R. 285-286, 281-282.

On April 27, 1998, Plaintiff again saw Dr. Parks for a medication check. Dr. Parks stated: "He has had some recurrence in a lot of his depressive symptoms. He is really not dealing well with his disability. He is beginning to have feelings of

---

[1] The second statement does not specify the time period covered.

hopelessness and helplessness again." However, Dr. Parks stated that he would continue Plaintiff on his present medications citing their past efficacy. He opined that Plaintiff "might just be going through a bit of a dip in his mood due to his severe disability." Dr. Parks also informed Plaintiff that he would be leaving town, and therefore turning his case over to Linda Lewis. R. 287.

On April 8, 1999, Tammy Brown, Psy.D., conducted a Consultative Examination of Plaintiff. Plaintiff was diagnosed with Major Depression Recurrent, Mild; Panic Disorder with Agoraphobia; R/O Borderline Intellectual Functioning; Degenerative Disc Disease, Obesity, and Arthritis, by history; Marital, Transportation, and Financial Stressors; Current GAF of 60. She stated that Plaintiff's prognosis was guarded due to his lack of insight. R. 403-404.

Between July 8, 1999 and March 16, 2001, Plaintiff saw Linda Lewis, MSN, and Sam Caputo, D.O., seventeen times for counseling sessions to address his panic attacks and depression. On July 8, 1999, Plaintiff reported having panic attacks when he left his house. He was prescribed Celexa and Klonopin. R. 476-495.

On August 23, 1999, Dale Halfaker, Ph.D., conducted a Comprehensive Psychological Evaluation at the request of the Division of Vocational Rehabilitation. Based upon an interview and testing, Dr. Halfaker stated Plaintiff exhibited significant features of depression with adjustment difficulties, and that his anxiety and panic attacks were likely features of his depression and sonic avoidant personality traits. Plaintiff received a full scale IQ score of 84 (Borderline) on the Wechsler Adult Intelligence Scale – Revised.[2] Dr. Halfaker found Plaintiff to have a GAF of 58. Plaintiff's score on the MMPI-2 revealed a highly elevated invalidity score, which Dr. Halfaker interpreted to suggest Plaintiff might be "exaggerating his emotional symptomology in order to convince others of the seriousness of his problems and to get help." However, Dr. Halfaker also found Plaintiff to be motivated and cooperative during testing, therefore, stating that the test results were believed to be a valid, accurate, and

---

[2] Dr. Halfaker also administered the Weschler Adult Intelligence Scale-Revised to Plaintiff on December 18, 1995. At that time, Plaintiff's full scale IQ score was 93 (Average).

5

reliable estimate of his psychological status. R. 409-416.

On August 25, 1999, progress notes signed by Linda Lewis and Dr. Caputo state that Plaintiff's mood had improved from the last visit. He was additionally prescribed Remeron and Ultram. On October 27, 1999, the notes state that Plaintiff continued to suffer from depression but that his panic attacks were under control. On November 24, 1999, Plaintiff's affect was observed to be much brighter and he was more able to work on personal issues. On February 14, 2000, Plaintiff was doing much better and handling life better, but he still continued to have problems with panic attacks.

*B. Medical Records–Physical*

On October 8, 1996, James Godard, D.O., diagnosed Plaintiff with degenerative arthritis and degenerative disc disease of the lumbar spine. He recommended Plaintiff take Ibuprofen and reduce his weight. R. 174. On October 14, 1997, Plaintiff was seen by Mark Crabtree, M.D., because of chronic back pain. Dr. Crabtree reviewed a CT scan obtained in 1996, which showed degenerative change at multiple levels with no specific abnormalities, other than a slight bulge at L5-S1 of no clinical significance. Dr. Crabtree's exam produced a negative straight leg raise, with the exception of some mild back pain. Dr. Crabtree stated that Plaintiff's back pain on a musculoskeletal basis was most likely related to his obesity. He recommended diet and exercise. He stated Plaintiff's degenerative disc disease demonstrated by the CT scan did not warrant surgical intervention. R. 183.

On January 7, 1998, Plaintiff was seen by David Showers, D.O., for a Consultative Examination at the request of the Disability Determinations Section. Dr. Showers stated that Plaintiff appeared to have significant degenerative disease involving his back and legs. R. 212.

On January 23, 1998, State agency physician, Joan E. Cantor, D.O., completed a Residual Physical Functional Capacity Assessment. Based on her review of the medical records, Dr. Cantor stated that Plaintiff retained the residual functional capacity ("RFC") to occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for a total of 6 hours in an eight hour day, and sit for a total of

6

6 hours in an eight-hour day. She stated that Plaintiff should be limited to only occasional stooping or crawling and should avoid concentrated exposure to vibration. She stated Plaintiff's complaints of disabling pain were not supported by objective evidence. Dr. Cantor noted that there were no medical source statements from treating or examining physicians in the file regarding Plaintiff's physical capacities. R. 218-224.

Plaintiff saw Dr. John Fry, D.O., several times from February 20, 1997 to February 2, 1998, complaining of back and shoulder pain. He received a prescription for Naprosyn. On November 5 and 24, 1997, Plaintiff received an injection of Xylocaine and Depo-Medrol for bursitis in his shoulder. An X-ray of Plaintiff's shoulder on December 3, 1997, found no evidence of a foreign body. An MRI of Plaintiff's shoulder on January 2, 1998 showed a possible partial rotator cuff tear and impingement syndrome. R. 226-233.

Another Residual Physical Functional Capacity Assessment was completed by a non-examining State agency physician on March 17, 1998. Dr. Ruth Stoecker's assessment was similar to Dr. Cantor's, except Dr. Stoecker found Plaintiff to be more limited in his ability to lift and carry and also found limitations based on Plaintiff's left rotator cuff. Dr. Stoecker also stated that Plaintiff's allegations of disabling pain were not supported by the medical evidence. R. 234-241.

Plaintiff received physical therapy for his shoulder from March 17, 1998 to April 2, 1998. R. 251-268. Plaintiff was seen by Dr. Paul Olive, on referral from Dr. Fry, for evaluation of his left shoulder and low back pain. Dr. Olive found degenerative changes in Plaintiff's back and a bulging disc at L5-S1. Dr. Olive diagnosed chronic back pain, but did not believe Plaintiff was a surgical candidate. Dr. Olive did believe shoulder surgery could be beneficial. R. 271.

On March 16, 1999, Morfeo M. Suva, M.D., conducted a Consultative Examination of Plaintiff at the request of the Disability Determinations Section. After examining Plaintiff and reviewing the medical records, Dr. Suva diagnosed chronic low back pain, left shoulder tendinitis and degenerative disease, panic disorder with agoraphobia, and obesity, marked. R. 395-398.

On June 22, 1999, Michael Clarke, M.D., completed a Medical

Assistance/General Relief Certification Form diagnosing Plaintiff with degenerative disc lumbar and mechanical low back pain and certified that Plaintiff was eligible for medical assistance. R. 470.

*C. The ALJ's Decision*

The ALJ found that Plaintiff had the severe impairments of degenerative disc disease in the lumbarsacral spine, tendonitis and degenerative joint disease in the shoulder, obesity, anxiety, and depression. He found that Plaintiff did not have any impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. pt. 404, subpt. P, App. 1.

The ALJ discredited the opinion of Dr. Parks, Plaintiff's treating psychiatrist, finding Dr. Parks' treatment notes to be inconsistent with the Medical/Psychological Source Statements he completed showing Plaintiff to be markedly limited in his ability to maintain a full-time work schedule. The ALJ also found Plaintiff's testimony regarding the severity of his pain to be not fully credible.

The ALJ found Plaintiff retained the RFC to lift and carry 10 pounds frequently and 20 pounds on occasion, and in an eight-hour workday, he could sit, stand, and walk for totals of six hours each with normal breaks. He would have to avoid frequent repetitive or overhead use of the upper extremities; should avoid climbing; should only occasionally stoop or crouch; and should avoid extreme vibration. His impairments of depression and anxiety would restrict him from high stress activity, such as fast paced activity or changes in work settings; frequent and prolonged contact with the general public; and jobs that would require sustained high levels of concentration. The ALJ found Plaintiff retained the capacity for simple unskilled tasks, normal contact with coworkers and occasional contact with the general public; and jobs requiring only a simple routine or repetitive tasks.

The ALJ found Plaintiff's RFC would preclude him from performing his past relevant work, which was described as skilled and heavy. A Vocational Expert testified that a person with Plaintiff's age, education, work experience, and functional capacity described above could perform other light, unskilled jobs existing in significant numbers

8

in the national economy, specifically that of office helper and mail clerk.  Therefore, the ALJ found Plaintiff was not "disabled" as defined in the Social Security Act.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole.  Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion.  [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted).  Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision.  Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)).  Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Plaintiff argues that ALJ erred in discrediting the opinion of Dr. Parks, Plaintiff's treating psychiatrist.  "[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2002) (quoting Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002)).  However, "[a] treating physician's opinion "do[es] not automatically control, since the record must be evaluated as a whole." Id. (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)).  The Court may uphold an ALJ's decision to "discount or even disregard the opinion of a treating physician where other medical assessments 'are supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. at 921 (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).

The ALJ noted significant discrepancies between Dr. Parks' progress notes from

9

July 3, 1996 to April 27, 1998, and his Medical/Psychological Source Statements – Mental.  Dr. Parks' progress notes, with one exception, consistently reported Plaintiff was relatively stable and well-controlled by his medication.  Even when Plaintiff was experiencing worsening symptoms, Dr. Parks suggested they were not severe, describing them as a "bit of a dip in his mood."  The only progress note consistent with his MPSS-M was on December 3, 1997, when Dr. Parks reported a significant worsening of Plaintiff's panic attacks and agoraphobia.  However, by January 6, 1998, Plaintiff was doing well again and was reasonably stable.  Dr. Parks' MPSS-Ms, on the other hand, stated Plaintiff was markedly limited in his ability to complete a normal workday and workweek, an assertion that was not reflected in his treatment notes.  Likewise, Plaintiff's treatment notes from Linda Lewis and Dr. Caputo[3] during the relevant time period described Plaintiff's symptoms as under control and improving.  Accordingly, the ALJ did not err in discounting the opinion of Dr. Parks.[4]

Plaintiff also argues the ALJ erred by failing to consider Plaintiff's alleged borderline intellectual functioning to be a severe impairment.  The ALJ acknowledged Plaintiff's full scale IQ score of 84 on August 23, 1999, led Dr. Halfaker to diagnose Plaintiff with borderline intellectual functioning.  However, this score was inconsistent with the score of 93, deemed in the average range, that he obtained in 1995, also under testing by Dr. Halfaker.  Moreover, the ALJ found that Plaintiff's intellectual functioning did not adversely affect his ability to work.  Rather, he stated that Plaintiff had completed high school, albeit with some special education, and additional vocational

---

[3] Dr. Caputo's Medical Source Statement completed May 17, 2001, showing Plaintiff's substantially deteriorated condition, is not consistent with his treatment notes during the relevant time period.  While Plaintiff may have become disabled after 1999, Dr. Caputo's treatment notes during the relevant period do not reflect an inability to work.

[4] The ALJ was not required to recontact Dr. Parks to determine the meaning behind his Medical/Psychological Source Statements, as Plaintiff argues.  "The regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable."  Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006).

10

training. Further, Plaintiff had successfully worked in the skilled occupations of pipefitter and welder. The ALJ stated that Plaintiff had not shown his intellectual functioning had significantly declined since he had last performed these jobs. A person's IQ is presumed to remain stable over time. Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). Therefore, the ALJ did not err in rejecting Plaintiff's assertion that his intellectual functioning was a severe impairment because that assertion was not supported by the record. See Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998).

Plaintiff argues the ALJ erred in analyzing Plaintiff's credibility. The ALJ found Plaintiff's testimony regarding the severity of his pain to be uncredible. The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that he experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.

11

> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

The ALJ found inconsistencies between Plaintiff's allegations of his limitations and the evidence of record. For instance, Plaintiff testified that he needed to lie down four to six hours a day to relieve his pain. He also testified that his pain medication caused drowsiness. However, the ALJ noted that Plaintiff's medical records do not reflect that he reported any of this to his doctors. The ALJ also found that Plaintiff's medically determinable impairments would not be expected to produce the level of limitation described by Plaintiff. Plaintiff's records show degenerative disc disease and a slight bulge at L5-S1. No doctor believed Plaintiff's back problems warranted surgical intervention. Furthermore, the Court notes that Drs. Cantor and Stoecker both stated that Plaintiff's medical records did not support his complaints of disabling pain. The ALJ also considered evidence that Plaintiff had previously exaggerated his symptoms. Dr. Halfaker stated that Plaintiff's performance on the MMPI-2 revealed a highly elevated invalidity score, suggesting Plaintiff may be "exaggerating his emotional symptomology." Because the ALJ's credibility determination was supported by substantial evidence, the Court will defer this his finding. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Finally, Plaintiff argues the ALJ erred in formulating his physical RFC. The record reflects that Plaintiff's treatment for his back and shoulder problems was conservative and generally limited to pain relief. Plaintiff was prescribed Naproxen, Duradyne, and Parafon DSC. Plaintiff also received injections for his shoulder on two occasions. Plaintiff was also advised to lose weight. None of Plaintiff's examining or treating physicians provided functional capacity assessments for Plaintiff; therefore, the ALJ properly considered the RFC assessment completed by Dr. Stoecker, a State agency medical consultant. See 20 C.F.R. § 404.1545(a)(3) ("We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations."). Plaintiff also

12

Case 6:07-cv-03248-ODS   Document 23   Filed 11/14/08   Page 12 of 13

contends the ALJ did not adequately consider the consequences of Plaintiff's obesity in formulating the RFC. However, the ALJ adequately addressed Plaintiff's limitations due to his back problems, and these limitations fairly embrace the consequences of his obesity. Accordingly, the ALJ did not err in formulating Plaintiff's physical RFC.

### III.  CONCLUSION

The Commissioner's decision is supported by substantial evidence in the record as a whole, so his decision denying benefits is affirmed.

IT IS SO ORDERED.

DATE: November 14, 2008

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT